[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-13341
Non-Argument Calendar
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 21, 2010
JOHN LEY
ACTING CLERK

D. C. Docket No. 08-00348-CR-CAP-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DEBRA M. SHEPARD,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 21, 2010)

Before BLACK, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Debra Shepard appeals from the district court's determination that the evidence was sufficient to support the magistrate judge's finding that she was guilty of engaging in disorderly conduct on property owned and run by the Department of Veterans Affairs ("VA"), in violation of 38 C.F.R. § 1.218(a)(5). On appeal, Shepard argues that the evidence was insufficient to support her conviction because it was a police lieutenant's unreasonable decision to call all available officers to the phlebotomy lab, rather than her conduct, that caused a disturbance on VA property. She contends that any boisterous behavior she may have engaged in is properly viewed as her natural reaction to police intimidation. For the reasons set forth below, we affirm.

## I.

In February 2008, a police officer issued a citation to Shepard for engaging in disorderly conduct on VA property, in violation of 38 C.F.R. § 1.218. Shepard proceeded to a bench trial before a magistrate judge.

At trial, James Richardson testified that he was employed by the VA Hospital in Atlanta as a phlebotomy supervisor. He explained that a phlebotomist is an individual who draws blood from patients. One of the employees that Richardson supervised was Shepard. On February 28, 2008, Richardson was at work when a lab technician informed him that a patient had complained that an

2

employee was taking photographs while his blood was being drawn. Richardson believed that it was a violation of VA regulations to take photographs inside the building. After speaking with the patient, Richardson discovered that it was Shepard who had been taking the pictures. Richardson told Shepard to stop taking photographs. Shepard, however, denied that she had been taking photographs.

Richardson further testified that, later that day, another phlebotomy employee informed him that Shepard had continued to take photographs. Richardson sent an email to the VA Chief of Police, Jeffrey Garrett, informing him that a patient had been concerned because Shepard had been taking photographs in the phlebotomy lab area. Approximately 15 to 20 minutes later, another phlebotomy employee informed Richardson that there was a "confrontation" involving the police officers. As he went to check on the situation, Richardson ran into Garrett, and they walked toward the phlebotomy lab together. When Richardson saw Shepard, he told her to give her camera to the police officers. Shepard responded by calling Richardson a "fucking liar." On cross-examination, Richardson testified that he was the subject of a complaint that Shepard had filed with the Equal Employment Opportunity Commission ("EEOC") in February 2007.

Garrett testified that, during February 2008, he was employed as the Chief of

3

Police for the VA facility in Atlanta. On February 28, 2008, he received an email from Richardson, in which Richardson informed him that Shepard had continued to take photographs in the phlebotomy lab after being asked to stop doing so. Garrett responded by telling Lieutenant Rodney Hawkins about the email and directing him to ask Shepard why she was taking photographs. Garrett further directed Hawkins to review the photographs and take action as he deemed appropriate. Garrett believed that photography was not allowed on the premises. VA police officers received reports of unauthorized photography between six to ten times a year, and they normally responded by questioning the person taking the photographs and reviewing the photographs. He explained that they investigated the photographs in order to protect patients' rights and prevent security breaches.

Garrett further testified that, a short time after he asked Hawkins to speak with Shepard, Hawkins contacted Garrett via radio to request that additional officers report to the phlebotomy lab. Garrett could hear "some sort of disturbance" and a "loud female voice" in the background. When Garrett reached the phlebotomy lab, he observed that Shepard was engaged in a confrontation with several officers, and heard her direct profanity toward Richardson. Garrett estimated that, on a scale of one to ten, Shepard's volume was at an eight. During

4

this incident, "many" employees gathered in the doorways of the lab to see what was happening. Garrett directed the officers to move these employees away from the doorways. After Shepard directed profanity toward Richardson, Garrett motioned to Hawkins that he and the other officers should take Shepard downstairs. Shepard resisted going downstairs by sitting in her chair and stating that she would not leave until the chief of police arrived. When Shepard made this statement, Garrett ensured that Shepard could clearly see him, and told her that she was required to comply with the officers. At that point, Shepard left the lab with the officers.

Quinton Dozier testified that he was employed by the VA Hospital in Atlanta as a police sergeant. On February 28, 2008, he responded to a call that Hawkins needed officers to assist him in the phlebotomy lab. When he reached the lab, he observed that Hawkins was asking Shepard for her camera, and she was stating that she did not have a camera. Dozier offered the following description of Shepard's behavior:

> She was uncooperative. They kept – Lieutenant Hawkins kept asking her for the camera, she kept saying she didn't have it, she don't have a camera. He asked her to come with him down to the police station, and she refused. She was really loud, pretty much trying to talk over him. Whatever he said, just like she pretty much jumped in and spoke louder than him, saying she's not doing this or not until she speaks to Chief Garrett.

5

He estimated that, on a scale of one to ten, the volume of Shepard's voice was at a six or seven. Dozier opined that Shepard was disruptive in the sense that she disrupted the flow of traffic in and out of the phlebotomy lab, and her tone of voice was such that other employees stopped working to come over to her area to see what was happening.

Hawkins testified that he was employed by the VA as a police lieutenant. On February 28, 2008, Garrett asked him to investigate a complaint that Shepard had been taking photographs. When he reached the lab, he explained to Shepard that someone had reported that she was taking photographs, and she denied having taken any photographs or possessing a camera. Hawkins informed Shepard that, if she did not turn over her camera, he would escort her to the police office. Shepard responded that she wanted to speak to the hospital's director. Hawkins told Shepard that she could speak to the director after he deleted the pictures she had taken from her camera. Thereafter, Shepard called the director's office, and Hawkins called for back-up officers because he anticipated that he would need to escort Shepard to the police office, and he did not want to touch her without witnesses present.

Hawkins further testified that, after Shepard called the director's office, she stated that they had informed her that Garrett would be responding to the situation.

6

She told Hawkins that she would comply with his instructions, but then sat down and stated that she would wait for Garrett. Hawkins explained that, throughout his encounter with Shepard, her voice had been elevated. He estimated that, on a scale of one to ten, the volume of her voice was at a seven. At Garrett's command, several officers began to escort Shepard to the VA police office. Hawkins heard Shepard repeatedly tell the officers, in an elevated voice, to "get off [her]." Hawkins responded by walking into the hallway, where he saw Shepard pulling away from the officers and trying to use her cell phone.

Once Shepard was inside the police office, another officer asked her for her camera, and she reached into her sweater and pulled out a digital camera. Hawkins explained that Shepard had created a disruption in that five or six lab employees stopped working, and the officers that typically patrolled other areas of the hospital were diverted from their tasks to attend to Shepard. In addition, several employees blocked a doorway into the lab. Hawkins clarified that, when he issued a call for back-up, he issued a "code 44 blue," which was a direction that all officers should report for assistance. On cross-examination, Shepard estimated that, after he called for back-up assistance, seven or eight officers, including himself, were in the lab with Shepard.

After Hawkins concluded his testimony, Shepard moved for a judgment of

7

acquittal, which the magistrate denied.

Thereafter, Shepard testified that she was employed by the VA as a phlebotomist. In March 2007, she had filed an EEOC employment against the VA, alleging sexual harassment, workplace violence, and retaliation. She had named Richardson in the complaint. Shepard was representing herself in her EEOC complaint. She had taken photographs in the lab in order to respond to a judge's discovery order in her EEOC case. Shepard did not believe that she was violating VA policy by taking these photographs. Shepard testified consistently with the officers that Hawkins approached her about her behavior, and that she denied taking photographs. She called the director because she thought the director would understand that she was taking the photographs to support her EEOC complaint. She informed Hawkins that the photographs were for her lawsuit. By the time she had finished her conversation with the director's office, numerous officers had arrived in the lab. She believed that these officers had been called because Richardson was retaliating against her for filing an EEOC complaint. Shepard conceded that her voice had been "elevated" during her police encounter, and that she told officers to "to get off [her]." She denied using profanity.

After Shepard concluded her testimony, she renewed her motion for a judgment of acquittal, which the magistrate again denied.

8

The magistrate found that Shepard was guilty of violating 38 C.F.R. § 1.218(a)(5). The magistrate stated that Hawkins's decision to call for more than one back-up officer seemed to needlessly create an intimidating atmosphere. Nevertheless, the magistrate explained that:

> It's not clear who said what to whom or how, what photos can be taken or not be taken, but Lieutenant Hawkins and his people are charged with keeping the peace, and often that means you have got to first investigate to find out who is right or wrong . . . . And I'm going to find the defendant guilty of disorderly conduct, because I believe she impeded the job of the law enforcement officers.

The magistrate emphasized that Shepard had a duty to obey the officers, and that they reasonably determined that they needed to investigate what sort of photographs she had taken. He noted that Shepard had lied to the officers, refused to follow their instructions, and generally acted in a loud and boisterous manner. The court sentenced Shepard to pay a fine of $175.

Shepard appealed the magistrate's verdict to the district court. The district court affirmed the magistrate's verdict. The court reasoned that the record supported the magistrate's findings that Shepard refused to obey officers, lied to them, and engaged in loud and boisterous behavior. Thus, the court reasoned, even if the officers needlessly created an atmosphere of intimidation, the evidence was sufficient to support her conviction.

### III.

9

We review *de novo* whether the evidence was sufficient to support a conviction, resolving all reasonable inferences in favor of the verdict. *United States v. Brown*, 415 F.3d 1257, 1270 (11th Cir. 2005). When reviewing the sufficiency of the evidence, we consider "whether the evidence, construed in the light most favorable to the government, would permit the trier of fact to find the defendant guilty beyond a reasonable doubt." *Id.* (quotation omitted). "It is not our function to make credibility choices or to pass upon the weight of the evidence." *Id.* (quotation omitted). Rather, we will affirm the verdict where the record provides a reasonable basis to support it. *Id.*

Pursuant to 38 U.S.C. § 901, the VA Secretary may set forth regulations to maintain law and order on VA property. 38 U.S.C. § 901(a)(1). This authority includes the power to promulgate rules for conduct on VA property. 38 U.S.C. § 901(b)(1). Whoever violates such a regulation is punishable by a fine or a maximum term of six months' imprisonment. 38 U.S.C. § 901(c).

Pursuant to § 901, the VA Secretary has promulgated 38 C.F.R. § 1.218, which governs conduct on VA property. 38 C.F.R. § 1.218(a). This regulation includes a section, entitled "Disturbances," which prohibits:

> Conduct on property which creates loud or unusual noise; which unreasonably obstructs the usual use of entrances, foyers, lobbies, corridors, offices, elevators, stairways, or parking lots; which otherwise impedes or disrupts the performance of official duties by

10

> Government employees; which prevents one from obtaining medical or other services provided on the property in a timely manner; or the use of loud, abusive, or otherwise improper language; or unwarranted loitering, sleeping, or assembly is prohibited.

38 C.F.R. § 1.218(a)(5).

While there is a general lack of case law addressing convictions for disorderly conduct on government property, we have held that the record must demonstrate how the defendant's behavior caused a disruption. *Johnson v. United States*, 394 F.2d 984 (5th Cir. 1968). In addition, at least one of our sister circuits has concluded that it is appropriate to focus on the extent to which the defendant impeded a government employee in the performance of his official duties. *United States v. Schembari*, 484 F.2d 931, 933, 936-37 (4th Cir. 1973) (holding that the defendant's conduct, which included forcibly breaking through a line of police officers charged with forming a protective barrier between protesters and the Pentagon, provided a sufficient basis for a guilty verdict).

Here, the evidence was sufficient to support the magistrate's determination that Shepard was guilty of disorderly conduct under 38 C.F.R. § 1.218(a)(5). The plain language of § 1.285(a)(5) prohibits conduct that: (1) "creates loud or unusual noise"; (2) "otherwise impedes or disrupts the performance of official duties by Government employees;" or (3) involves "the use of loud, abusive, or otherwise improper language." 38 U.S.C. § 1.218(a)(5). Richardson, Garrett, Dozier, and

11

Hawkins all testified that Shepard's voice was loud – Dozier placed the volume of her voice at a level six or seven, and Garrett placed her volume at a level eight. When Hawkins asked Shepard for her camera, she refused to turn it over to him and denied possessing a camera, despite the fact that she had a camera in her sweater. She resisted Hawkins's request for her to proceed to the police office, and resisted officers when they escorted her to the office. Hawkins testified that, when he called for back-up assistance, other officers were diverted from their usual duties to attend to Shepard. Garrett testified that "many" VA employees had gathered in the doorways of the phlebotomy lab to witness the confrontation, and that he had to direct his officers to clear the doorways. Shepard did not contest that she was loud and upset, or that employees other than the police officers gathered near the lab. Based on this testimony, there was sufficient evidence to support the magistrate's conclusion that Shepard's conduct was loud and boisterous, and that she impeded the duties of VA officers.

While Shepard argues that it was Hawkins who impeded the duties of other police officers by unnecessarily directing all officers to report to phlebotomy lab, this argument does not change the result in this case. By resisting Hawkins's attempt to investigate whether she had taken unauthorized photographs, Shepard impeded the official duties of at least one VA employee. Even if it were

12

unreasonable for Hawkins to call for the assistance of all officers, it appears that Shepard's resistance caused it to become necessary for him to divert at least one additional officer away from his official duties. Moreover, her vociferous resistance to Hawkins's investigation caused other VA employees to halt their duties and congregate in the lab doorways. Thus, the evidence shows that Shepard directly interfered with a government employee's official duties, regardless of whether Lieutenant Hawkins needlessly ordered all available officers to assist him in the phlebotomy lab.

**AFFIRMED.**