**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 24-11011

Non-Argument Calendar

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

KAVON JACKASAL,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:22-cr-00233-KKM-TGW-1

————————————

Before JILL PRYOR, NEWSOM, and BRASHER, Circuit Judges.

PER CURIAM:

Kavon Jackasal appeals his conviction for distributing the fentanyl that caused Valerie Mouw's death. He argues that the district court abused its *Daubert* discretion by admitting a Drug

Enforcement Administration chemist as an expert witness—according to Jackasal, the chemist's methodology wasn't sufficiently reliable. And he argues that there wasn't enough evidence for a reasonable jury to find that the fentanyl he distributed to Mouw resulted in her death. We disagree and affirm.

## I

"[I]t is difficult to persuade a court of appeals to reverse a district court's judgment on *Daubert* grounds." *United States v. Brown*, 415 F.3d 1257, 1264 (11th Cir. 2005). After all, we review a district court's decisions about the admissibility and reliability of expert opinion for abuse of discretion. *United States v. Barton*, 909 F.3d 1323, 1330 (11th Cir. 2018). We are especially sensitive to district courts' discretion with respect to "*Daubert* issues in particular, an area where the abuse of discretion standard thrives." *Brown*, 415 F.3d at 1266. Of course, "granting considerable leeway is not the same thing as abdicating appellate responsibility." *Id.* In the *Daubert* context, we may still conclude that a district court has abused its discretion if it "applies the wrong law, follows the wrong procedure, bases its decision on clearly erroneous facts, [] commits a clear error in judgment," or "essentially abdicat[es] its gatekeeping role." *Id.*

This appeal is about Rule 702's familiar standards for admission of expert testimony. *See* Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court identified four factors to use when determining whether expert testimony is sufficiently reliable under Rule 702: "(1) whether [the

expert's methodology] can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) what its known or potential rate of error is, and whether standards controlling its operation exist; and (4) whether it is generally accepted in the field." *Brown*, 415 F.3d at 1267; *see Daubert*, 509 U.S. at 593–94.

The district court here did not abuse its *Daubert* discretion. Abimael Vasquez, the DEA forensic chemist, described at length how his lab uses gas chromatography-mass spectrometry (or "GC-MS") to compare recovered substances with the DEA's internal library of standard reference chemicals. Vasquez testified that GC-MS is a reliable test, that GC-MS is widely used and accepted in the scientific community, that the DEA built its reference-material library from an accredited source, and that the DEA double-checked reference material by running its own tests. On the basis of Vasquez's extensive testimony, the district court found that he employed a reliable methodology in a reliable manner. The court assessed the *Daubert* factors and concluded that the government had made a strong enough showing because Vasquez "clearly testified that these methods are generally accepted in the scientific community" and because "there is some peer review of especially the gas spectrometer, which is . . . considered the gold standard by at least some peer-reviewed literature." Day Three Trial Tr. at 289:10–17, Dkt. No. 160. There's no reason to think that Vasquez wasn't a credible witness, and in any event, witness credibility is "the province of the factfinder." *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994). And most importantly, Rule 702's inquiry is "a flexible one"; there is no "definitive checklist or test." *Daubert*, 509

U.S. at 594, 593.   On these facts, and in these circumstances, we cannot conclude that the district court abused its discretion in admitting Vasquez's testimony.

Jackasal has one principal argument to the contrary.  As he sees things, it is error for a district court to allow expert testimony to be presented to a jury when the only justification for the reliability of the expert's method is that it is generally accepted.  Jackasal concedes our previous holding that "[i]n the right circumstances," a district court may admit "expert opinion evidence that does not meet three of the four *Daubert* factors."  *Brown*, 415 F.3d at 1267.  But here—he insists—the district court relied on just one *Daubert* factor (general acceptance), and this case doesn't have the "right circumstances."  He stresses in particular the fact that Vasquez testified to a jury, while the expert in *Brown* testified in a bench trial.  *See id.* at 1269 ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

Jackasal's rigid position is inconsistent the *Daubert* test's flexible character.  "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).  "Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination."  *Id.* at 142.  Here, the district court was well within its discretion to conclude that at least one *Daubert* factor wasn't quite suited to assessing the reliability of Vazquez's method.  The court reasoned that "given the kind of test at issue," "falsi[fia]bility"

isn't "something that makes sense for the test that we have." Day Three Trial Tr. at 289:22–290:2. We defer to the district court's judgment on this point.

More importantly, Jackasal gives the district court too little credit. It isn't quite right to say—as Jackasal does—that the district court applied a "one-factor test." Br. of Appellant at 23. Yes, the district court found that Vasquez's methods "are generally accepted" (the fourth *Daubert* factor). Day Three Trial Tr. at 289:11. But the district *also* found that GC-MS testing "is considered the gold standard by at least some peer-reviewed literature" (a reference to the second *Daubert* factor). *Id.* at 289:13–15. While Jackasal protests that the DEA's specific application of GC-MS testing hasn't been the subject of any peer-reviewed literature, Br. of Appellant at 11, he never provides any reason to believe that GC-MS more generally is anything other than the "gold standard." We will not nit-pick the precise level of generality at which peer-reviewed literature may reasonably suggest to a district court that expert testimony is reliable. So, in light of the above, even considering that the evidence was presented to a jury, we don't see how the district court could have "abdicat[ed] its gatekeeping role." *Brown*, 415 F.3d at 1266.

## II

We "will not overturn a jury's verdict if there is any reasonable construction of the evidence that would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *United States v. Clay*, 832 F.3d 1259, 1294 (11th Cir. 2016) (citation

6                    Opinion of the Court                    24-11011

modified).[1] In other words, we "will reverse a conviction based on insufficient evidence only if no reasonable trier of fact could have found" the defendant guilty beyond a reasonable doubt. *United States v. Williams*, 865 F.3d 1328, 1337 (11th Cir. 2017) (citation modified). "The evidence need not exclude every reasonable hypothesis of innocence . . . for a reasonable jury to find guilt beyond a reasonable doubt," and "[t]he jury is free to choose among alternative, reasonable interpretations of the evidence." *United States v. Beach*, 80 F.4th 1245, 1255–56 (11th Cir. 2023).

To support a conviction under § 841(a)(1), the government must show that the defendant knowingly or intentionally distributed a controlled substance. 21 U.S.C. § 841(a)(1). Section 841(a)'s penalty-enhancement provision provides that a defendant shall be sentenced to a term of not less than 20 years' imprisonment, or more than life, if he distributed a Schedule I or II drug and death or serious bodily injury "results from the use of such substance." *Id*. § 841(b)(1)(C). For the enhancement to apply, the government must prove that the drug's use was the but-for cause of the victim's death. *See Burrage v. United States*, 571 U.S. 204, 218–19 (2014). And

---

[1] We review the sufficiency of the evidence de novo, viewing the evidence in the light most favorable to and drawing all reasonable inferences and credibility choices in support of the jury's verdict. *United States v. Ifediba*, 46 F.4th 1225, 1237, 1242 (11th Cir. 2022). But if a defendant fails to clearly object to the sufficiency of the evidence in the trial court, we review for plain error. *United States v. Joseph*, 709 F.3d 1082, 1103 (11th Cir. 2013). Jackasal and the government appear to disagree about the proper standard of review here. Because Jackasal doesn't persuade us even under de novo review, we don't address this dispute.

"[b]ecause the 'death results' enhancement increase[s] the minimum and maximum sentences to which [a defendant is] exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt." *Id.* at 210.

A reasonable jury could conclude that the evidence establishes, beyond a reasonable doubt, Jackasal's guilt under the death-results enhancement. Mouw's messages with Jackasal indicate that Jackasal had provided fentanyl for her in the past because she'd asked to trade crack cocaine for fentanyl. Around midnight on the day of her death, Mouw made arrangements for a delivery from Jackasal. The jury could reasonably infer that Mouw was looking to have Jackasal deliver what he'd sold her in the past and was free to credit police testimony that the previous substance was fentanyl. Though the fentanyl in Mouw's room didn't seem to be from the same batch as the fentanyl seized from Jackasal's car, police testified that street-level drug dealers often use different sources for the same drug. And the officer posing as Mouw asked Jackasal to bring the same product that he delivered to Mouw the day before—and Jackasal duly brought fentanyl. From this evidence and more the jury was free to infer that Jackasal, and nobody else, delivered fentanyl to Mouw mere hours before her overdose death.

Jackasal's theory that Mouw might actually have died from a gabapentin—not fentanyl—overdose doesn't change our conclusion. A jury could reasonably believe the toxicologist's and the medical examiner's testimony that fentanyl was the but-for cause of Mouw's death. The toxicologist testified that there was enough

fentanyl in Mouw's system for her to overdose and that the position in which her body was found was typical for fentanyl overdoses. And the medical examiner testified that: the amount of fentanyl in Mouw's system could be considered therapeutic only if she had respiratory support; there was no reason to believe that other drugs in her system played a role in her death; a gabapentin overdose would have caused hypertension and Mouw died instead of suffocation; and no gabapentin pill fragments were found in Mouw during the autopsy. From this, the jury could reasonably infer that fentanyl—not gabapentin—caused her death.

### III

For the foregoing reasons we hold, first, that the district court did not abuse its discretion in admitting Vasquez's expert testimony. And, second, that sufficient evidence supported the jury's verdict that death resulted from Jackasal's distribution of fentanyl.

**AFFIRMED.**