[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14254

_____

Agency No. 012681-10

WILLIAM J. KARDASH, SR.,

Petitioner - Appellant,

versus

COMMISSIONER OF IRS,

Respondent - Appellee.

_____

Petition for Review of a Decision of the U.S. Tax Court

_____

(August 4, 2017)

Before WILLIAM PRYOR, MARTIN, and BOGGS,[*] Circuit Judges.

BOGGS, Circuit Judge:

Appellant William Kardash challenges the Tax Court's determination that he is liable as a transferee under 26 U.S.C. § 6901 for his former employer's unpaid taxes. For the following reasons, we affirm.

_____

[*] Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

A

Appellant William Kardash was a shareholder and employee of Florida Engineered Construction Products Corporation ("FECP"). FECP manufactured concrete lintels and sills for use in construction, particularly new residential construction, and had been doing so in some corporate form since 1955.[1] Kardash joined the company, then called Cast Crete, in 1979 as a plant engineer and was quickly promoted to president of engineering in 1980. When FECP was formed in 1986, Kardash was one of its founding shareholders and was promoted again, this time to president of manufacturing and operations. Kardash remained in this position until he retired from the company in January 2014.

At all times relevant to this appeal, Kardash owned 575,000 shares of FECP stock. The company's remaining shares were owned by Ralph Hughes, John Stanton, and Charles Robb. Hughes and Stanton, who served as FECP's chairman of the board and president respectively, each owned 3,000,000 shares of stock. Robb served as president of FECP's residential division and owned 75,000 shares of stock. As the proportion of their stock ownership suggests, Hughes and Stanton effectively controlled the company.

---

[1] The company was founded as Cast-Crete Corporation of America ("Cast Crete") in 1955. FECP was incorporated on December 31, 1986, and immediately assumed all of Cast Crete's operations. The two companies did not formally merge until February 1996.

2

During the early 2000s, FECP's revenues rose dramatically with the booming housing market. In 1999, FECP earned $39.9 million in revenue, but by 2005, FECP's revenues had risen to $132.2 million. Unfortunately for FECP, however, 2005 represented the high-water mark for the company. By 2007, the housing bubble in Florida had already begun to burst, and FECP's revenues shrank to $55.4 million.

Throughout this period, FECP paid no federal income tax and its majority shareholders, Hughes and Stanton, siphoned substantially all of the cash out of the company.[2] The two are believed to have used hidden bank accounts and shell corporations to facilitate their fraud undetected. At no point was Kardash, who focused on managing FECP's production operations, involved in the cash-siphoning scheme.

In 2009, the Commissioner issued a notice to FECP informing the company of its tax deficiencies, additions, penalties, and interest accrued during the years 2001 to 2007. This marked the beginning of a three-year investigation into FECP's assets and other outstanding liabilities. The investigation revealed that FECP's assets had a fair market value of approximately $3,000,000. Of some relevance to this appeal, Kardash contests this valuation, arguing that FECP

---

[2] Between 2003 and 2007, Hughes siphoned $62,037,927 and Stanton $56,469,747.

3

actually possessed cash and equity worth approximately $8,500,000.[3]  Regardless,

the Commissioner never elected to levy FECP's bank accounts or seize its assets.

Instead, the Commissioner entered into an agreement with FECP in which the

company stipulated that it owed the IRS $129,130,131.60, which it would repay in

monthly installments of $70,000.  At this rate of payment, FECP would satisfy its

tax liability in a little over 150 years.  Should FECP begin to afford larger monthly

installments, however, the agreement stipulated that the Commissioner could

increase FECP's monthly obligation at his discretion.

　　　While its investigation into FECP's tax liability was still ongoing, the

Commissioner began to pursue funds that, he argues, FECP fraudulently

transferred to its shareholders.  Stanton and Hughes, the majority-shareholder

masterminds of the cash-siphoning scheme, were easy targets.  Stanton was

ultimately convicted on eight counts of federal tax crimes and, per the terms of his

sentencing order, required to pay restitution.  The Commissioner likewise reached

an agreement with the estate of Hughes, who had passed away in 2008.  Robb and

Kardash, however, contested the Commissioner's determination of liability in the

---

[3] Kardash reaches this figure by combining FECP's reported cash reserves ($421,421), accounts receivable ($1,195,408), equity in assets ($2,602,556), equity in vehicles ($2,500,000), equity in inventory ($1,022,309) and bank accounts ($815,077).  These figures were accurate according to FECP's Form 433-B filed with the IRS in July 2011, when the Commissioner's investigation was still ongoing.  Form 433-B is used by the IRS to determine the financial status of a company with outstanding tax liabilities.

tax court below, arguing that they were not liable as transferees for FECP's outstanding tax liability.  Only Kardash's transfers are the subject of this appeal.

B

As detailed by the tax court in the proceedings below, the Commissioner's theory of transferee liability focused on two sets of payments from FECP to Kardash: "Advance Transfers" of $250,000 and $300,000 in 2003 and 2004 respectively, and "Dividend Payments" of approximately $1.5 million, $1.9 million, and $57,500 in 2005, 2006, and 2007.  According to the Commissioner, all of these payments were actually or constructively fraudulent transfers under the Florida Uniform Fraudulent Transfer Act ("FUFTA") because FECP did not receive any value from Kardash in exchange and FECP was insolvent or the transfers led to FECP's insolvency.  Kardash argued that both the Advance Transfers and Dividend Payments were designed to replace his lucrative bonuses, which FECP had temporarily suspended in 2003.  Thus, according to Kardash, the transfers were part of his compensation package and not fraudulent.  In any event, Kardash reasoned, FECP did not become insolvent until 2006, meaning that any prior payments could not satisfy the insolvency element of constructive fraud.  Kardash also argued that, FUFTA notwithstanding, the IRS failed to exhaust all

5

reasonable collection efforts against FECP before pursuing transferee liability against him, in violation of 26 U.S.C. § 6901.

The tax court below rejected Kardash's exhaustion argument out of hand, reasoning that the existence of any exhaustion requirement depended upon state law, and FUFTA did not impose one. Although the tax court agreed with Kardash with respect to the Advance Transfers, reasoning that they were designed to replace FECP's prior bonus program, it held that the Dividend Payments were not compensation and therefore constituted actual or constructive fraud. The tax court further held that, despite the fact that FECP only became insolvent in 2006, Kardash's 2005 dividend payment could be grouped together with the 2005 dividend payments to Stanton and Hughes and considered constructively fraudulent because all of the payments "were part of a series of transactions that led to the insolvency of FECP." Only the status of the Dividend Payments is the subject of this appeal.

## II

We review the tax court's factual findings for clear error and its legal conclusions *de novo*. *Estate of Atkinson v. Comm'r*, 309 F.3d 1290, 1293 (11th Cir. 2002) (citation omitted). This is the same standard of review that we apply "in the same manner and to the same extent [to] decisions of the district courts in civil

actions tried without a jury." *L.V. Castle Inv. Group, Inc. v. Comm'r*, 465 F.3d 1243, 1245 (11th Cir. 2006) (quoting 26 U.S.C. § 7482(a)(1)).  Moreover, "[a] finding of fraud is a finding of fact, which we will not set aside on appeal unless it is clearly erroneous." *First Ala. Bank of Montgomery, N.A. v. First State Ins. Co.*, 899 F.2d 1045, 1057 (11th Cir. 1990) (citations omitted).

## A

Kardash first argues that 26 U.S.C. § 6901 imposes an exhaustion requirement upon the IRS that, as a matter of federal law, requires the Commissioner to pursue all reasonable collection efforts against the transferor (in this case FECP) before collecting from the transferee.  The Commissioner disagrees, arguing that, although § 6901 establishes a procedure for transferee liability in the case of a delinquent transferor, the substance of transferee liability is governed by the relevant state law.  Since the relevant state law in this case, FUFTA, does not require a collector to exhaust all reasonable collection efforts against a transferor before proceeding against the transferee, the Commissioner argues that the IRS is likewise not bound to do so.  Each party points to a wealth of Tax Court opinions that support his view, meaning, as the Commissioner succinctly put it: "[I]t is apparent that precedent is divided on this issue." Appellee's Br. at 29.

7

We are not the first court to wrestle with the ambiguities contained within

§ 6901. In *Commissioner v. Stern*, 357 U.S. 39 (1958), the Supreme Court dealt

with a similar question involving § 6901's substantively identical predecessor

statute, § 311 of the Internal Revenue Code of 1939.[4] Noting that disagreement

existed "on the question whether the substantive liability enforced under § 311 is to

be determined by state or federal law," *id.* at 42, and that the text of the statute did

not answer the question, the Court began by examining legislative history. Prior to

the enactment of § 311, the Court explained:

> the rights of the Government as creditor, enforceable only by bringing
> a bill in equity or an action at law, depended upon state statutes or
> legal theories developed by the courts for the protection of private
> creditors, as in cases where the debtor had transferred his property to
> another. . . . This procedure proved unduly cumbersome . . . in
> comparison with the summary administrative remedy allowed against
> the taxpayer himself.

*Id.* at 43 (citations omitted). Thus, § 311 was intended "to provide for the

enforcement of such liability to the Government by the procedure provided in the

act for the enforcement of tax deficiencies," thereby permitting the government to

avoid complicated suits against transferees in state and federal courts. *Id.* (quoting

S. Rep. No. 69-52, at 30 (1926) (Conf. Rep.)). As such, § 311 provided a

---

[4] § 311, in turn, is substantively identical to § 280 of the Revenue Act of 1926. *See Stern*, 357 U.S. at 43. All portions of § 6901 that are relevant to this appeal can be traced back to § 280.

8

procedural remedy to the government "[w]ithout in any way changing the extent of such liability of the transferee under existing law." *Ibid.* (quoting H.R. Rep. No. 69-356, at 43 (1926) (Conf. Rep.)).  Because "§ 311 is purely a procedural statute," the Court reasoned, "we must look to other sources for definition of the substantive liability." *Id.* at 44.  The *Stern* Court would go on to conclude that Kentucky state substantive law governed the extent of transferee liability in that case.[5]  *Id.* at 45.

The question for us, then, is what source of law provides the definition of substantive liability in this case?  The text of the statute provides a helpful clue.  § 6901 discusses the liability of a transferee in terms of "at law or in equity."  26 U.S.C. § 6901(a)(1)(A).  As *Stern* discussed, this statute was passed against a backdrop of various legal and equitable remedies that the Commissioner could use to collect against a transferee--remedies that the Court made clear that § 6901, as a purely procedural statute, left unchanged.  Before the passage of § 6901, "the Government was relegated to proceed either in equity against the transferee by

---

[5] The question in *Stern* was whether the beneficiary of a life-insurance policy held by a deceased tax debtor could be held liable as a transferee for the policyholder's unpaid taxes.  The Court held that, because Kentucky state substantive law did not permit beneficiary liability except in cases of fraud, the Commissioner was barred from collecting from the beneficiary as a transferee under § 311.  *Stern*, 357 U.S. at 45–47.

way of a creditor's bill,[6] or in law under the theory of a third-party beneficiary if the transferee had assumed the debts of the transferor."  Ronald S. Rizzo, *Transferee Liability*, 21 Tax Law 223, 223 (1967) (citation omitted).  In order to proceed in equity, "there are two significant elements that must appear[:] the insolvency of the transferor, *and an exhaustion of remedies against the transferor*."  *Id.* at 225 (emphasis added).  Under principles of federal equity law, therefore, the Commissioner *would* have to exhaust all remedies against FECP before proceeding against Kardash.  *See Healy v. Comm'r*, 345 U.S. 278, 284 n.16 (1953) ("To sustain transferee liability the Commissioner  must prove that he is unable to collect the deficiency from the transferor."); H.R. Rep. No. 69-356, at 43 (1926) (Conf. Rep.) (describing the state of federal equity law prior to the passage of § 6901, noting that "[p]roceedings against the transferee are ordinarily had in equity, though if the taxpayer is still in existence, an unsatisfied return of execution must be had against him and a creditor's bill brought to satisfy the judgment").

Unfortunately for Kardash, however, § 6901 also permits the Commissioner to proceed against transferees "at law."  At the time that § 6901's predecessor statute was passed in 1926, few state or federal laws existed governing transferee

---

[6] *Creditor's Bill*, *Black's Law Dictionary* (5th ed. 1979) ("Equitable proceeding brought to enforce payment of debt out of property or other interest of debtor which cannot be reached by ordinary legal process.").

10

liability. Where they did exist, however, the Commissioner was free to utilize them as he would any other remedy to proceed against the transferees of a delinquent taxpayer. *See* H.R. Rep. No. 69-356, at 43 (1926) (Conf. Rep.) ("By reason of . . . various State statutory provisions the transferee of assets of an insolvent transferor is ordinarily liable for the accrued and unpaid taxes of the transferor."). Since that time, a number of states including Florida have codified a uniform body of transferee-liability law. Under Florida's law, FUFTA, transferee liability is not dependent upon the creditor proving that all remedies have been exhausted against the transferor. Fla. Stat. § 726.101–726.112. Because the Florida statute further defines creditor to include any "government or governmental subdivision or agency," the Commissioner is entitled to rely upon it to collect against an alleged transferee in a § 6901 proceeding. *Id.* at § 726.102(5), (10).

Stated another way, the existence of an exhaustion requirement in a transferee-liability claim depends upon the legal theory under which the Commissioner brings his claim. If brought under federal equity, then exhaustion is required. If brought under state or federal statute, then the substantive law of the statute governs. § 6901, as a purely procedural statute, permits both. Because the state substantive law in this case does not require exhaustion for liability to exist,

11

we hold that the Commissioner was not required to exhaust remedies against FECP before proceeding against Kardash as a transferee.

## B

Having concluded that Florida state substantive law governs the extent of transferee liability in this case, we must now determine whether Florida law permits the Commissioner to establish transferee liability against Kardash. Of relevance to this case, FUFTA permits a creditor to collect against a transferee of a debtor under a theory of constructive fraud[7] where the creditor's claim "arose before the transfer was made," and the debtor "made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and . . . was insolvent at that time or . . . became insolvent as a result of the transfer or obligation." *Id.* at § 726.106(1). Kardash raises two challenges to the Tax Court's determination that the 2005, 2006, and 2007 Dividend Payments constituted constructive fraud: 1) FECP received value from his services in exchange for the Dividend Payments, and 2) the Dividend Payments cannot be grouped together with the fraudulent transfers made to Stanton and

---

[7] As opposed to actual fraud, which consists of "the intentional and successful employment of any cunning, deception, or artifice used to circumvent or cheat another," constructive fraud involves "any act of commission or omission . . . [that] is contrary to good conscience and operates to the injury of another." *Fraud*, *Black's Law Dictionary*, *supra* note 6.

12

Hughes in order to satisfy the insolvency requirement. Neither argument has merit.

Kardash first argues that the Dividend Payments were designed to replace FECP's defunct bonus program, and, as such, FECP received reasonably equivalent value from the services he provided in exchange. As an initial matter, it is undisputed that both Kardash and FECP fiscally characterized the transfers as dividends. FECP reported the transfers as dividends on its IRS Form 1099-DIV, and Kardash reported the transfers as qualified dividends on his tax returns. Kardash benefitted from this designation, too, paying a lower marginal rate on the distributed dividends than he would have paid if the transfers were reported as bonus compensation. *See* 26 U.S.C. § 1(h)(11). Finally, like dividend transfers, these payments were based on Kardash's percentage of stock ownership in FECP. Based on this information, the Tax Court made a fact finding that FECP received no value in exchange for the dividends and that they were therefore constructively fraudulent.

Kardash encourages this court to look to the substance of the Dividend Payments rather than their form and hold that the Dividend Payments are indistinguishable from the Transfer Payments that the Tax Court concluded were compensation. Kardash can point to no legal authority, however, in support of the

13

proposition that transfer payments that a corporation and a shareholder expressly declare to be dividends can nonetheless be considered compensation as a matter of law. On the contrary, what little case law exists on this issue suggests that dividend payments *are not* considered compensation as a matter of law. *In re Brentwood Lexford Partners, LLC*, 292 B.R. 255 (Bankr. N.D. Tex. 2003), provides a good example. In that case, a bankruptcy trustee sought to set aside a series of allegedly fraudulent transfers from a company's bankruptcy estate, including several dividend payments that the recipients claimed were compensation for services rendered. As in this case, the recipients argued that the dividends were designed to make up for a salary discrepancy, with one recipient explicitly arguing that he "viewed the excess cash flow distribution as a bonus." *Id.* at 267. The bankruptcy court sided with the trustee. Noting that "none of [the recipients] had an employment contract . . . providing that the excess cash flow distribution would be part of their salary or a bonus as part of their compensation," the court looked to the form of the contested transfer payments and concluded that they were dividends and not compensation. *Ibid.* ("The court finds that the distributions were made to the equity holders . . . on account of their equity interest and not to the individuals on account of services rendered.").

14

We hold that the same principles apply here.  Because Kardash cannot definitively prove that the Dividend Payments were a part of his employment with FECP and because he did not raise any other argument for why FECP might have received reasonably equivalent value even if the dividends were not compensation,[8] we must conclude that they were dividends for which FECP did not receive reasonably equivalent value.  As such, we affirm the Tax Court's determination that the reasonable-value element of constructive fraud under FUFTA was satisfied for all of the Dividend Payments.

Kardash next argues that the Tax Court erred by grouping his 2005 dividend payment with the 2005 dividend payments to Stanton and Hughes in concluding that the insolvency element of constructive fraud was also satisfied.  In order to establish the insolvency element of constructive fraud under FUFTA, a claimant must show either that the debtor was insolvent at the time of the transfer or became insolvent as the result of the transfer.  Fla. Stat. § 726.106(1).  Although the language of the statute speaks in terms of a single transfer of property, courts have

---

[8] A company can receive value for dividends in some other circumstances.  *See In re Northlake Foods. Inc.*, 715 F.3d 1251, 1256 (11th Cir. 2013) (holding that a shareholder provided value to a company by agreeing to a contract that would allow the company to alter its corporate status in exchange for dividends).

15

interpreted the language to apply to a series of related transactions. *See In re Mussa*, 215 B.R. 158, 169 (Bankr. N.D. Ill. 1997) (citing a list of cases).[9]

The Tax Court below found that FECP became insolvent by January 2006, and neither party disputes that finding here. Therefore, Kardash's argument concerns only the status of the 2005 dividend payment—it is undisputed that FECP's actual insolvency satisfies the insolvency element of constructive fraud for both the 2006 and 2007 dividend payments.

Kardash argues that because his 2005 dividend payment was small, both in relation to the dividends paid to Stanton and Hughes and in relation to FECP's total assets, the Tax Court erred in grouping them together and concluding that they were part of a series of transactions that led to FECP's insolvency. Kardash's point is not without some merit. In 2005, Kardash received dividend payments totaling just over $1.5 million. In the same year, dividends paid to Stanton and Hughes totaled $16.6 million and $21.5 million respectively, and FECP's net equity fell from $58 million to negative $12 million. Taken by itself, Kardash's 2005 dividend payment seems paltry in comparison to the fraudulent cash

---

[9] Although the Illinois case is not interpreting FUFTA, it is nonetheless instructive because it is interpreting identical language contained in the version of UFTA adopted by the state of Illinois.

16

siphoning conducted by Stanton and Hughes and the impact that those payments had on the solvency of FECP.

But the law does not instruct us to evaluate Kardash's 2005 dividend payment in isolation. Although Kardash was not privy to the machinations of Stanton and Hughes, his 2005 dividend payment was part of the same series of dividend payments that led to FECP's insolvency. Kardash, Hughes, and Stanton were all paid dividends based upon their equity ownership in the company. The record does not reflect, for example, that FECP issued different classes of shares and that Stanton and Hughes perpetrated their fraud by triggering special dividends that were distributed solely to their class of shares. On the contrary, the record suggests that the dividends were paid on a per-share basis and that any discrepancy in the amounts paid to Kardash, Hughes, and Stanton can largely be attributed to the different number of shares that they owned.[10]

Although Kardash presents a sympathetic case, he has not demonstrated that the Tax Court committed clear error in grouping his 2005 dividend payment with

---

[10] Kardash disagrees, pointing to the fact that the Tax Court initially "decline[d] to group the transfers to petitioners with the transfers to Messrs. Hughes and Stanton for the purpose of determining whether the transfers to petitioners were fraudulent" as indicative that the dividend payments were unrelated. Appellant Br. at 30 (alteration in original) (citation omitted). Kardash takes the Tax Court out of context, however. There, the Tax Court was determining whether the dividend payments constituted *actual* fraud, where the intent of the transferor is an important factor and where distinguishing between the unaware Kardash and the active fraudsters makes a great deal of sense. Determining constructive fraud requires no such distinction.

17

those paid to Stanton and Hughes.  And when considered together, those dividend payments are substantial enough for the Tax Court to conclude that they led to the insolvency of FECP.  For these reasons, we affirm the Tax Court on this point as well.

## III

William Kardash was not a villain.  By all accounts, he was a victim of the fraud conducted by his friends and coworkers at FECP, Ralph Hughes and John Stanton.  In perpetrating that fraud, however, they transferred funds from FECP to Kardash that rightly belonged to the IRS, and the law of Florida requires that he pay those funds back.  We therefore DENY the petition to review the decision of the Tax Court.

18