[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16140
_____

D.C. Docket No. 8:15-cv-02788-CEH,
Bkcy No. 8:11-bkc-12150-KRM

In re: TELTRONICS, INC.,

Debtor.

_____

KEVIN T. O'HALLORAN,
as Trustee of the Liquidating Trust of Teltronics, Inc.,

Plaintiff - Appellant - Cross Appellee,

versus

HARRIS CORPORATION,
RPX CORPORATION,

Defendants - Appellees - Cross-Appellants.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(October 2, 2018)

Before TJOFLAT and JULIE CARNES, Circuit Judges, and KAPLAN,[*] District Judge.

KAPLAN, District Judge:

This is an appeal from a judgment that affirmed an order of the Bankruptcy Court dismissing a fraudulent conveyance claim by the trustee of the liquidating trust of Teltronics, Inc. ("Teltronics") against Harris Corporation ("Harris") and RPX Corporation ("RPX"). The trustee claims principally that the bankruptcy judge erred in (a) concluding that the trustee had not sustained his burden of proof on the issue of whether Teltronics received reasonably equivalent value in exchange for the transfer and (b) receiving certain expert testimony offered by defendants, ostensibly on the issue of whether Teltronics was insolvent at the time the transfer was made. We affirm on the basis that (1) the Bankruptcy Court made no material error in ruling on the admissibility of evidence and (2) there was no error in the conclusion that the trustee failed to prove that Teltronics was insolvent at the time of the transfer. We therefore do not reach the lower courts' decisions as to reasonably equivalent value.

## I. FACTS

---

[*] Honorable Lewis A. Kaplan, United States District Judge for the Southern District of New York, sitting by designation.

2

Teltronics was in the telecommunications business until its assets were sold in bankruptcy. Harris is an international communications technology company that provides communications products, systems and services. RPX is a defensive patent aggregator the business of which is acquiring patents to protect operating companies from frivolous enforcement litigation.

In 2000, Teltronics purchased a portfolio of patents from Harris in exchange for a promissory note to Harris in the amount of approximately $6.8 million. The obligations were restructured in 2002, with the amount due on the promissory note increased to roughly $9.2 million.

Teltronics defaulted on the promissory note in 2004. In an effort to reduce its debt, it entered into a patent transfer agreement (the "Transfer Agreement") pursuant to which it transferred the patent portfolio back to Harris in exchange for (1) a credit of approximately $1.275 million on the amount that Teltronics owed Harris, and (2) a non-exclusive license to use the patent portfolio to make and sell digital telephone switch products. Under the Transfer Agreement, Teltronics retained certain other rights as to the patents, including a limit until July 31, 2010 on Harris' ability to transfer the patents (the "Blocking Right") and a right of first refusal that gave Teltronics an ability to reacquire the patent portfolio in the event that Harris intended to sell it after July 31, 2010 (the "Teltronics ROFR").

3

In 2008, Harris began discussions with RPX about selling the patent portfolio. On December 19, 2008, the companies agreed in principle to a price of $12 million.

While reviewing documents to be sent to RPX for purposes of its due diligence, Harris realized that it needed to address Teltronics' Blocking Right, which remained in effect until July 31, 2010, in order to close the sale to RPX. On January 7, 2009, Harris contacted Teltronics with a request that Teltronics modify its rights. Harris did not then disclose that it had any specific plans to sell the patents.

After some back and forth, Harris and Teltronics executed an amendment to the Transfer Agreement (the "Amendment") on January 21, 2009. Pursuant to the Amendment, Harris, in exchange for $5,000, acquired the right to transfer the patents until April 16, 2009 unencumbered, except to a Teltronics competitor. The Amendment provided also that the Teltronics ROFR would become effective on April 16, 2009, rather than on July 10, 2010. Five days later, on January 26, 2009, Harris transferred the patents to RPX (the "Assignment").

Teltronics filed a Chapter 11 petition on June 27, 2011 in the United States Bankruptcy Court for the Middle District of Florida. As part of Teltronics'

4

confirmed reorganization plan, a liquidating trust was established for the benefit of certain Teltronics creditors and Kevin O'Halloran was appointed trustee.

## II. PROCEEDINGS BELOW

The trustee filed this adversary proceeding against Harris and RPX on June 25, 2013.  He claimed that the transfer of the Blocking Right and the Teltronics ROFR were constructively fraudulent and sought to (1) avoid both the modification of the Blocking Right and the Teltronics ROFR and the transfer of the patents pursuant to the Assignment, and (2) recover, pursuant to Sections 544 and 550 of the Bankruptcy Code and Florida Statutes 726.105(1)(b) and 726.106(1), the value of those transfers.

### A.    Competing Experts at Trial in Bankruptcy Court

The adversary proceeding was tried before Bankruptcy Judge Michael Williamson.  In order to prevail on his claims that the Blocking Right and Teltronics ROFR had been subjects of constructively fraudulent transfers, the trustee had to establish that the modifications of the rights constituted transfers by Teltronics.  Assuming that they were indeed transfers, he had to prove two additional elements in order to prevail.  First, he had to establish that Teltronics

5

received less than reasonably equivalent value in the transfers. Second, he had to establish that Teltronics was insolvent at the time of the transfers.

At trial, the parties called competing experts as to Teltronics' solvency at the time of the transfers. This appeal turns on the trial court's denial of the trustee's motions to strike certain of the testimony of Harris and RPX's expert, Steven Oscher.

In order best to present the questions raised on appeal, it is useful first to describe the expert testimony on both sides. To that end, we summarize the competing expert testimony and then, against that background, move on to the trustee's motions to strike.

### 1. Mr. Mukamal's Testimony

Barry Mukamal, who testified for the trustee, had undertaken a solvency analysis as to Teltronics. He opined that the company was insolvent – in other words, that the adjusted value of the company's liabilities exceeded the adjusted value of its assets – as of December 31, 2008, in his view by approximately $5.6 million.

### 2. Mr. Oscher's Testimony

The competing expert, Mr. Oscher opined that (1) Mr. Mukamal's solvency opinion was flawed because it improperly failed to account separately for the value

6

of three longstanding maintenance contracts to which Teltronics was a party, (2) the value of the assets on Teltronics' balance sheet should have been increased by the aggregate value of those three contracts, and (3) Teltronics was solvent at the time of the transfer. Mr. Oscher did not give an opinion as to the extent by which Teltronics' assets exceeded its liabilities. But his opinion as to solvency necessarily implied that the value of the three contracts, in Mr. Oscher's view, was more than $5.6 million, even if only slightly.[1]

In considering Mr. Oscher's testimony, it is critical to understand that the burden of proof was on the trustee to show that Teltronics was insolvent at the time of the transfer. *See Kardash v. Comm'r of IRS*, 866 F.3d 1249, 1256 (11th Cir. 2017) ("In order to establish the insolvency element of constructive fraud under [Florida fraudulent conveyance law], a claimant must show either that the debtor was insolvent at the time of the transfer or became insolvent as the result of the transfer."). Perhaps in consequence of the fact that the burden was on the trustee,

---

[1]

> The reasoning is this: First, Mr. Mukamal testified that Teltronics was insolvent by $5.6 million without separately reflecting the value of the three contracts as assets on the balance sheet. Second, essentially the only aspect of Mr. Mukamal's opinion with which Mr. Oscher took issue was Mr. Mukamal's failure to reflect those assets on the balance sheet. Accordingly, it follows that Mr. Oscher's opinion that Teltronics was solvent necessarily depended on the premise that the addition of the value of the contracts to Mr. Mukamal's otherwise materially undisputed balance sheet would have rendered Teltronics solvent. In order for that premise to be true, the contracts in Mr. Oscher's view must have been worth at least somewhat more than $5.6 million.

Mr. Oscher did not offer any opinion as to the specific value of the three maintenance contracts aside from the necessary implication that they were worth at least $5.6 million.   At one point, however, he did illustrate the impact that increasing the value of Teltronics' assets by the value of the contracts could have had on Teltronics' balance sheet.   In doing so, he testified that *if* the fair market value of the contracts had been $8.5 million, a figure that he took from a valuation conducted by a third-party that Mr. Oscher used for "demonstrative purposes," the value of Teltronics' assets would have been sufficient to render the company solvent on the date that the Amendment was executed.

### 3.   Mr. Mukamal's Rebuttal Testimony

In rebuttal, Mr. Mukamal did not dispute that the contracts, if accounted for separately, might be worth at least $5.6 million.   To be sure, he identified issues that might have led a factfinder to question the accuracy of the $8.5 million figure that Mr. Oscher used for "demonstrative purposes," but he set forth no alternative value for the contracts.   Rather, his principal dispute with Mr. Oscher was over whether the value of the contracts should have been included as a separate item on Teltronics' balance sheet.   He therefore focused his rebuttal not on the precise value of the contracts, but on what he claimed would have been the impropriety of

8

increasing the value of Teltronics' assets by the value of the contracts, whatever that may have been.

## B.    *Daubert* **Motions**

In sum, then, Mr. Oscher's testimony set forth the following:

1. His opinion that the value of Teltronics' assets on its balance sheet should have been increased by the value of the three maintenance contracts,

2. His opinion that Teltronics was solvent at the time of the transfers, which necessarily implied that the value of the contracts, in his view, was at least somewhat greater than $5.6 million, and

3. No opinion as to the precise value of the three contracts; although to illustrate his point, he testified that *if* the contracts had been worth $8.5 million, a borrowed figure that he used for "demonstrative purposes," *then* Teltronics would have been comfortably solvent at the time of the transfers.

At the close of Mr. Oscher's direct examination, the trustee moved, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), to strike Mr. Oscher's opinion that Teltronics had been solvent at the time of the transfer.

The motion was brief and specific:

9

"*[W]ith respect to the solvency opinion* that Mr. Oscher is rendering, he did not perform any valuation analysis of his own. What he said is, 'I looked at three other valuations and came to a conclusion.'

. . . .

. . . [H]e has done nothing in the way of his own analysis to present an expert opinion. He has merely adopted the analyses and valuations that have been prepared by others." (Emphasis added).[2]

The trustee briefly renewed his *Daubert* motion at the close of Mr. Oscher's testimony, saying, "[N]ot only did [Mr. Oscher] rely upon the analysis of others, he doesn't know anything about the reliability of those underlying analyses." Indeed, Mr. Oscher acknowledged during cross-examination that he had not conducted an independent analysis of the validity of the assumptions and projections underlying the reports that he reviewed in preparing his expert report. Nor had Mr. Oscher independently analyzed the discount rate and range of values incorporated into the Empire valuation of the three maintenance contracts.

The thrust of both motions thus was essentially the same. The trustee challenged the admissibility of Mr. Oscher's opinion that Teltronics had been solvent at the time of the transfers on the ground that Mr. Oscher did no work to back that opinion up nor verified the reliability of the materials to which he referred by way of illustration. The trustee, however, did not challenge the

---

[2]

Although the trustee did not precisely say so, he apparently was referring to Mr. Oscher's review for demonstrative purposes of various analyses conducted by third parties and of valuations conducted by Wells Fargo and Empire Valuation Consultants, LLC ("Empire").

10

admissibility of Mr. Oscher's opinion that the value of the three maintenance contracts should have been included on the list of assets on Teltronics' balance sheet.

The Bankruptcy Court denied the motions from the bench. Judge Williamson concluded that these issues did not reach the threshold of excluding the testimony, but went to the weight that it should be given in considering the evidence. Although the Bankruptcy Court ruled without prejudice to the trustee's renewing his *Daubert* motion after trial, the trustee did not renew the motion to strike Mr. Oscher's testimony.

### C.    Bankruptcy Court's Opinion

In a written opinion following trial, the Bankruptcy Court concluded that Teltronics in fact had transferred the Blocking Right under the Amendment, but nonetheless entered judgment in favor of Harris and RPX because the trustee had failed to prove by a preponderance of the evidence that Teltronics was insolvent at the time of the transfer. *O'Halloran v. Harris Corp. (In re Teltronics, Inc.)*, 540 B.R. 481, 484, 487-90 (Bankr. M.D. Fla. 2015).

The court began by finding that Mr. Oscher was more credible than Mr. Mukamal on the narrow issue of whether the maintenance contracts ought to have been valued separately and their value listed as assets on the balance sheet. *Id.* at

489. In other words, the court credited Mr. Oscher's opinion, the admissibility of which the trustee had not challenged, that the value of Teltronics' assets should have been increased by the value of the three contracts.

Having made this credibility judgment, the court proceeded from the proposition that the burden of proof was on the trustee to "prove the value of the maintenance contracts, when added to the other assets, [did] not exceed Teltronics' liabilities." *Id.* at 490. But the trustee had "offered no evidence of the value of the maintenance contracts." *Id.* Consequently, the court concluded, the trustee had failed to establish that Teltronics was insolvent at the time that it transferred the Blocking Right. *Id.*

Crucially, although the Bankruptcy Court, over the trustee's challenge, had admitted into evidence Mr. Oscher's opinion that Teltronics had been solvent at the time of the transfer, it neither credited nor relied on that opinion in entering judgment for defendants. Nor did the court accept or reject the $8.5 million figure that Mr. Oscher had used for "demonstrative purposes." Indeed, the court made no findings at all as to the value of the three maintenance contracts.

The Bankruptcy Court concluded also that the trustee had failed to prove by a preponderance of the evidence that Teltronics had received less than reasonably equivalent value in the transfer. *Id.* at 485-87.

12

On these two independent, alternative bases, the Bankruptcy Court held that the transfer was not constructively fraudulent and could not be avoided. The district court affirmed the Bankruptcy Court's ruling in full. *O'Halloran v. Harris Corp.*, No. 8:15-cv-2788-T-36, 2016 WL 4467254, at *3-5 (M.D. Fla. Aug. 24, 2016) (Honeywell, J.).

### III. DISCUSSION

The trustee here argues that the Bankruptcy Court erred in (1) admitting any of the testimony of Mr. Oscher, and (2) concluding that the trustee failed to establish that Teltronics (A) was insolvent at the time of the transfer, and (B) received less than reasonably equivalent value. The trustee argues also that the district court erred in affirming.

We hold that the Bankruptcy Court's receipt of Mr. Oscher's opinion that the value of the maintenance contracts, whatever it was, should have been included in the assets on Teltronics' balance sheet in order to determine its solvency – an opinion that was not objected to at trial – and the court's decision to credit that testimony were well within the bounds of its discretion. We find also no error in its conclusion that the trustee failed to prove that Teltronics was insolvent at the time of the transfer. We affirm on this basis and decline to reach either the

13

question of reasonably equivalent value or the admissibility of Mr. Oscher's solvency opinion.

## A.    Legal Framework of Fraudulent Transfers

Section 544(b) of the Bankruptcy Code authorizes bankruptcy trustees to avoid certain "transfer[s] of an interest of the debtor in property" that are "voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title."   11 U.S.C. § 544(b).   Section 550 creates additional remedies for transfers that have been avoided under Section 544, including a right on the part of the trustee to "recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from . . . the initial transferee of such transfer or the entity for whose benefit such transfer was made."  11 U.S.C. § 550(a).

The trustee alleges constructive fraudulent transfer under Florida Statutes 726.105(1)(b) and 726.106(1).

Under Section 726.105(1)(b), a transfer made by a debtor is fraudulent as to a creditor if the debtor (1) made the transfer "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation," and (2) either (A) "[w]as engaged or was about to engage in a business or a transaction for which the

remaining assets of the debtor were unreasonably small in relation to the business or transaction" or (B) "[i]ntended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due."

Similarly, under Section 726.106(1), a transfer made by the debtor is fraudulent as to a creditor if (1) "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation;" and (2) "the debtor was insolvent at that time or . . . became insolvent as a result of the transfer or obligation."

### B.    *Daubert* Motions

We begin with a discussion of the trustee's motions to strike under *Daubert*.

#### 1.   Deferential review of evidentiary decisions

A trial court's decisions regarding the admissibility and reliability of expert testimony are reviewed for abuse of discretion. *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S.136, 141-43 (1997)).[3] This Court will "not reverse an evidentiary decision of a district court 'unless the ruling is manifestly erroneous.'" *Id.* (quoting *Joiner*,

---

[3]

> "In a bankruptcy case, this Court sits as a second court of review and thus examines independently the factual and legal determinations of the bankruptcy court and employs the same standards of review as the district court." *In re Fisher Island Investments, Inc.*, 778 F.3d 1172, 1189 (11th Cir. 2015) (citation omitted).

15

522 U.S. at 142).  This is so because, by virtue of the trial court's role in presiding over trial proceedings, it is in the best position to decide such matters.  *See United States v. Brown*, 415 F.3d 1257, 1264-65 (11th Cir. 2005); *see also Frazier*, 387 F.3d at 1259.  Accordingly, lower courts "enjoy[] 'considerable leeway' in making these determinations."  *Frazier*, 387 F.3d at 1258-59 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)); *accord Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1027 (11th Cir. 2014).

### 2.  The trial court's gatekeeping function

A trial court is obliged to perform a gatekeeping function in considering the admissibility of technical expert evidence.  *Frazier*, 387 F.3d at 1260 (citing *Kumho Tire*, 526 U.S. at 147).  This duty "inherently require[s] the trial court to conduct an exacting analysis of the *foundations* of expert opinions to ensure they meet the standards for admissibility under Rule 702."  *Id.* (alteration in original) (internal quotation marks and citations omitted).[4]

---

[4]

Rule 702 provides:

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702.

16

In the context of a *Daubert* ruling, the district court has considerable

flexibility.  As we have stated before:

> "[I]t is difficult to persuade a court of appeals to reverse a district
> court's judgment on *Daubert* grounds.   The theme that shapes
> appellate review in this area is the limited nature of it. . . .
>
>      . . . .
>
>      What is true about the review of evidentiary issues in
> general applies with equal or even greater force to *Daubert*
> issues in particular, an area where the abuse of discretion
> standard thrives.  Immersed in the case as it unfolds, a district
> court is more familiar with the procedural and factual details
> and is in a better position to decide *Daubert* issues.  The rules
> relating to *Daubert* issues are not precisely calibrated and must
> be applied in case-specific evidentiary circumstances that often
> defy generalization.   And we don't want to denigrate the
> importance of the trial and encourage appeals of rulings relating
> to the testimony of expert witnesses."

*Brown*, 415 F.3d at 1264-66 (citations omitted); *see also McCorvey v. Baxter*

*Healthcare Corp.,* 298 F.3d 1253, 1257 (11th Cir. 2002) ("[O]ur review of

---

"[I]n determining the admissibility of expert testimony under Rule 702, we
engage in a rigorous three-part inquiry.  Trial courts must consider whether: (1)
the expert is qualified to testify competently regarding the matters he intends to
address; (2) the methodology by which the expert reaches his conclusions is
sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*;
and (3) the testimony assists the trier of fact, through the application of scientific,
technical, or specialized expertise, to understand the evidence or to determine a
fact in issue."

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d
548, 562 (11th Cir. 1998)).  The proponent of the expert testimony bears the burden of
establishing that each of these criteria is satisfied.  *Knight through Kerr v. Miami-Dade
Cnty.*, 856 F.3d 795, 808 (11th Cir. 2017) (citing *Frazier*, 387 F.3d at 1260).

evidentiary rulings by trial courts on the admission of expert testimony is very limited." (internal quotation marks and citation omitted)).

Our review is "even more relaxed in a bench trial situation, where the judge is serving as a factfinder and we are not concerned about 'dumping a barrage of questionable scientific evidence on a jury.'" *Brown*, 415 F.3d at 1268 (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999)); *see also id.* at 1269 ("There is less need for the gatekeeper to keep the gate when the gatekeeper is keeping the gate only for himself.").

### 3.  The *Daubert* Rulings

#### a.  Including contracts on Teltronics' balance sheet

The trustee contends that Mr. Oscher's testimony should have been excluded in its entirety.  He fails to note, however, that he did not object below to Mr. Oscher's opinion that the contracts should have been included in the assets on Teltronics' balance sheet, although he did offer a competing opinion.  The sole question of admissibility he raised was to Mr. Oscher's opinion that Teltronics had been solvent at the time of the transfer.

Rule 103(a) of the Federal Rules of Evidence states, "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and . . . a party, on the record: (A) timely objects or moves to

strike; and (B) states the specific ground, unless it was apparent from the context . . . ." Given that the sole focus of the trustee's *Daubert* objections to Mr. Oscher's testimony was directed to his opinion as to Teltronics' solvency, he failed to preserve any objection to the other portions of Mr. Oscher's testimony. The omission is aggravated by the trustee's failure to renew the motion to strike following trial despite the Bankruptcy Court's invitation to do so.

Even if the question were properly before us, the trustee's argument, insofar as it is directed to Mr. Oscher's opinion that the maintenance contracts should have been included on the balance sheet, would fail. The Bankruptcy Court did not abuse its discretion in admitting and then crediting this opinion.[5]

Mr. Mukamal, the trustee's expert, acknowledged that the practice of including intangible assets as separate items on a company's balance sheet "may not be flawed," but rather that it was a matter of the facts and circumstances of the

---

[5]

"When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985); *accord Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1335 (11th Cir. 1999); *see also Brown*, 415 F.3d at 1267 ("'The credibility of a witness is in the province of the factfinder,' and we 'will not ordinarily review the factfinder's determination of credibility.'" (quoting *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994) (per curiam))). Accordingly, "when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error." *Anderson*, 470 U.S. at 575.

case at hand. Mr. Mukamal argued that the contracts in this case were so embedded in the overall enterprise, indeed they were "necessary for the overall operation and value stream in a . . . discounted cash flow model, with respect to the entire organization," that they could not be valued distinctly from the enterprise. Mr. Oscher, on the other hand, maintained that the contracts were "clearly seen as separate entities or separate assets of Teltronics," as evidenced by the lending that was being done against the contracts.

The testimony presented a classic "battle of the experts." It was not clear error, and certainly not an abuse of discretion, for the bankruptcy court to admit Mr. Oscher's testimony on this point and then to find him more credible than Mr. Mukamal on the question of whether to include the contracts as separate assets on Teltronics' balance sheet.

### b. Solvency opinion

The trustee did preserve his objection to the Bankruptcy Court's receipt of Mr. Oscher's opinion that Teltronics was solvent. We decline to reach this objection, however, because it is immaterial on appeal.

Mr. Oscher's opinion that Teltronics was solvent at the time of the transfer necessarily implied his opinion that the value of the contracts was at least $5.6 million. It is true also that Mr. Oscher provided no basis for that view. It may well

20

be that there was a valid argument under *Daubert* to exclude this opinion, but the judge neither relied upon nor credited this opinion in his ultimate disposition of the case. Accordingly, the issue is academic.

        c.  Illustration representing value of the contracts as $8.5 million

Finally, the trustee's argument that the Bankruptcy Court erred in admitting Mr. Oscher's use of the borrowed $8.5 million figure for "demonstrative purposes" is unhelpful and immaterial to his appeal. As the trustee acknowledges in his brief, Mr. Oscher in fact did not opine that the value of the contracts was $8.5 million – that figure was used to demonstrate the impact that increasing the value of Teltronics' assets by the value of the contracts could have had on Teltronics' balance sheet.

The trustee nonetheless criticizes Mr. Oscher's "methodology" of taking the midpoint of the value range set forth in the Empire valuation as not generally accepted in the field of accounting. He points also to the fact that Mr. Oscher "did no analysis of the state of Teltronics' remaining balance sheet, or the cost to liquidate Teltronics' remaining assets, if the contracts were sold" and to Mr. Oscher's assignment of a value to the contracts without considering the costs involved with administering the contracts. These contentions might present serious

21

concerns had Mr. Oscher set forth an opinion that the contracts, in his view, were worth $8.5 million.  But as this testimony was merely used to demonstrate a point, the trustee's criticisms miss the mark.

Moreover, the Bankruptcy Court plainly did not rely on this illustration and in fact made no findings at all as to the value of the three contracts.  The only portion of Mr. Oscher's testimony that was credited by the Bankruptcy Court was his opinion that *some* value for the three contracts should have been reflected separately on the balance sheet for purposes of the solvency analysis.  The admissibility of the testimony related to Mr. Oscher's use of the $8.5 figure was immaterial.[6]

### C.   Insolvency

We now turn to the Bankruptcy Court's conclusion that the trustee failed to establish that Teltronics was insolvent at the time of the transfer.  We already have concluded that the Bankruptcy Court was entitled to find that Mr. Oscher was more credible than Mr. Mukamal on the narrow issue of "whether the maintenance

---

[6]

In any case, we doubt that it was an abuse of discretion for the Bankruptcy Court to conclude that the objections to Mr. Oscher's illustration using the $8.5 million figure went to the weight, rather than the admissibility, of the testimony.  A movant under *Daubert* "must establish that the district court 'abdicat[ed]' its duty, or that it 'applie[d] the wrong law, follow[ed] the wrong procedure, base[d] its decision on clearly erroneous facts, or commit[ted] a clear error in judgment.'" *United States v. Hollis*, 780 F.3d 1064, 1070 (11th Cir. 2015) (alterations in original) (quoting *Brown*, 415 F.3d at 1266). Although we note that this is a tall order for an appellant, we need not reach this question for purposes of this appeal.

contracts ought to be separately valued and added into the balance sheet." *In re Teltronics, Inc.*, 540 B.R. at 489. Nor were the Bankruptcy Court's subsequent analytical steps erroneous.

The trustee had the burden of proving by a preponderance of the evidence that Teltronics was insolvent at the time of the transfer. *Kardash*, 866 F.3d at 1256 ("In order to establish the insolvency element of constructive fraud under [Florida fraudulent conveyance law], a claimant must show either that the debtor was insolvent at the time of the transfer or became insolvent as the result of the transfer."). Having accepted that the value of the assets listed on the balance sheet as presented by Mr. Mukamal was incomplete without the inclusion of the value of the three maintenance contracts, the burden was on the trustee to prove that the value of those contracts was so small as to leave Mr. Mukamal's opinion as to insolvency unaffected. But he offered no such evidence. As the Bankruptcy Court properly found, he therefore failed to establish an essential element of his claim.

## IV. CONCLUSION

The judgment appealed from is AFFIRMED. Appellees' cross-appeal is DISMISSED as moot.